**Verne RICHARDSON, Glenna Wininger a/k/a Glenna Williams, Defendants-Appellants,**

v.

**STATE of Indiana, Plaintiff-Appellee.**

No. 1–485A88.

Court of Appeals of Indiana, First District.

Dec. 23, 1985.

Scales, Wissner & Krantz, Boonville, for defendants-appellants.

Linley E. Pearson, Atty. Gen., Gary Damon Secrest, Deputy Atty. Gen., Indianapolis, Stanley M. Levco, Evansville, for plaintiff-appellee.

## STATEMENT OF THE CASE

NEAL, Judge.

Defendant-appellants, Verne Richardson (Richardson) and Glenna Williams Wininger (Wininger), were convicted by the Daviess Circuit Court of two counts of conspiracy to utter a forged instrument. From sentences of imprisonment and fines, they appeal.

We reverse.

## STATEMENT OF THE FACTS

Count I of the Information charged that Richardson and Wininger conspired to utter the forged will of Beryl Jane B. Crawford (Crawford). Count II charged that Richardson and Wininger conspired to utter the forged Crawford assignment of six stock certificates of Interlake, Inc. to Wininger. To support the forgery element, the State produced two examiners of questioned documents who testified that the purported signatures of Crawford on the will and on the six stock certificates were forgeries.

The principal evidence presented by the State to support the conspiracy element is as follows: Richardson is an attorney-at-law practicing in Washington, Daviess County, Indiana, and Wininger is his secretary. In the course of his practice, Richardson did legal work for Crawford. Commencing in 1973, Crawford, who lived near Petersburg in adjoining Pike County, was aged and terminally ill with cancer of the throat and cirrhosis of the liver. She was an alcoholic, drank heavily and took quantities of pain pills. In 1978 she was de-

scribed by her physician as needing a guardian. Through Richardson, Wininger became her bookkeeper and secretary. As time progressed, Wininger effectively assumed the management of Crawford's estate, then valued at approximately $1,000,000.00.

Evidence was presented that in 1977, Wininger presented a document bearing Crawford's purported signature to one Rose Erwin for her witness. The circumstances of the presentment were such as to cause Erwin to believe she had been tricked. In 1978 William Hudson II, an attorney in the same building which Richardson's office was located, was asked by Wininger to attest to Crawford's signature on a will. It bore what was purported to be Crawford's signature and Rose Erwin's name was printed under a signature line. Crawford was not present, but upon Wininger's assurances that it was her signature, Hudson signed as a witness. Later Wininger told him that Rose Erwin was the other witness. Two or three months later, Richardson and Wininger asked Hudson to again attest the signature on the will of Crawford. Crawford was not present but Hudson and Richardson signed as witnesses anyway to what was purported to be Crawford's signature on a will. The earlier signature page was destroyed in his presence. Hudson identified the document as the one which formed the basis of the State's charge in Count I, i.e., the will.

Crawford died December 9, 1978, and the will was produced for probate. It provided that Wininger would receive 12,976 shares of stock in Interlake, Inc. (then valued at $26.00 per share, or $337,376.00) and the balance in certain bank accounts. In addition, it provided that Wininger would be co-executor. In will contest proceedings and in criminal proceedings before both federal and state grand juries, Hudson admittedly perjured himself concerning the circumstances of the execution of the will, including testimony that he and Richardson had driven to Crawford's home where the will was then properly executed and attested by the witnesses and Crawford in each others presence. During those court proceedings "strategy conferences" were held between himself, Wininger and Richardson. These conferences included driving Hudson to Crawford's home, where he had never been, so that he could accurately describe it. Hudson pleaded guilty in state court to perjury. Numerous joint bank accounts were opened by Wininger for her and Crawford from which Wininger admitted withdrawing $30,716.00 for her personal use over a two-year period. The money admittedly was mostly Crawfords, but Wininger claimed she had permission to make the withdrawals.

The six stock certificates representing the 12,976 shares of stock in Interlake, Inc. were transferred to Wininger upon the Crawford signature being guaranteed on July 5, 1978, by Richard Schrader, an officer of the First National Bank of Oakland City. Richardson and five other investors had taken over the bank on March 1, 1978, after which Richardson had become a director. Thereafter, in April of 1978, Richardson, by letter to Schrader, caused a bank account to be opened in that bank for $25.00, the money being furnished by Wininger in the joint names of Wininger and Crawford. Included in the letter was a signature card purportedly signed by Crawford. No satisfactory explanation was ever made why Crawford needed a $25.00 bank account in Gibson County, far from her home, or why her signature could not have been guaranteed by one of the local bankers. Schrader was given instructions by Richardson to send all matters concerning the account to him and not to Crawford, for Richardson did not want to bother her. In July, Richardson then asked Schrader if he could guarantee a signature to transfer stock for Crawford solely by a comparison with a signature card. Schrader said he could, but it was irregular.

Hudson saw the stock certificates in Richardson's office bearing only Crawford's signature. Richardson and Wininger requested Hudson's secretary, Virginia Stern, to type in Wininger's name and the date. After this was done, pursuant to

Richardson's instructions, Virginia Stern took the certificates to Schrader at Oakland City where he guaranteed the signatures. Then, upon Richardson's instructions, Wininger took the certificates to Thompson-McKenna, brokers in Evansville, for transfer rather than to Merill-Lynch, where Crawford had an account. Richardson said that Crawford instructed that the transfer be completed in that manner because she did not want Christopher, her son, to know of the transfer. The signatures of Crawford on the stock certificates, dated July 5, 1978, were forgeries and her signature on the signature card at the Oakland City Bank was also a forgery.

### ISSUES

Richardson and Wininger present the following issues for review:

I. Whether the trial court committed error by not granting the Motion to Dismiss, specifically concerning the appointment of the special prosecutor herein.

II. Whether the trial court committed error in allowing certain exhibits to be introduced into evidence as "known" signatures of Beryl Jane Crawford, and thereafter allowing certain experts to testify as to their opinions concerning said exhibits.

III. Whether there was sufficient evidence to support the verdicts herein.

### DISCUSSION AND DECISION

Issue I. *Special Prosecutor.*

■ On December 20, 1982, E. Brayton ·Smoot, the incumbent Prosecuting Attorney, whose term expired on December 31 following, filed his petition in the Daviess Circuit Court requesting the appointment of a special prosecutor in the investigation and prosecution of the matters involved here. On the same date the court appointed Stanley Levco, a Deputy Prosecuting Attorney from Vanderburgh County, as Special Prosecutor who thereafter accepted the appointment on January 13, 1983. On

January 1, 1983, Daniel Steiner became the new Prosecuting Attorney of Daviess County. The Informations against Richardson and Wininger were filed on March 11, 1983, after being approved by Levco. Prior to the filing of the Informations, a hearing was held concerning the authority of the special prosecutor, and the court ruled that Levco was properly appointed. On March 20, 1983, the new prosecutor, Daniel Steiner, filed his affidavit in support of the appointment of a special prosecutor. He alleged the appearance of impropriety in his acting because of his past professional associations with both Richardson and Wininger. Thereafter, on April 27, 1983, Richardson and Wininger's Motion to Dismiss was filed challenging Levco's authority. The motion was overruled on May 14, 1983. That denial is the issue here.

Relying totally upon *State ex rel. Goldsmith v. Superior Court of Hancock County* (1979), 270 Ind. 487, 386 N.E.2d 942, Richardson and Wininger argue that Levco was appointed improperly because the outgoing prosecutor could not disqualify the incoming prosecutor. In *Goldsmith,* a Marion County deputy prosecutor handling a criminal case filed his petition to withdraw requesting the court to appoint other counsel because he was potentially a witness in that case. The petition was filed on December 4, 1978, granted on December 29, and the incumbent prosecutor left office on December 31, 1978. In its order the court disqualified the entire Marion County Prosecutor's staff and appointed outside counsel. In an original action brought by Goldsmith, the newly elected prosecutor, the supreme court held (1) an entire prosecutor's staff is not disqualified because one of its members would merely be a witness, and (2) the petition to withdraw filed by an outgoing prosecutor cannot bind the incoming prosecutor.

IND.CODE 33-14-1-6 provides that the court may appoint a special prosecutor where "(B) the prosecuting attorney agrees that a special prosecutor is needed." When an elected prosecutor admits his disqualification and requests the appointment of a

special prosecutor, a factual determination of the basis is not necessary. *King v. State* (1979), Ind.App., 397 N.E.2d 1260 *trans. denied.* In *King*, the defendant, as here, filed a motion to dismiss claiming that the indictment was defective because it had not been signed by the proper person, that is, the duly elected prosecuting attorney. *King* claimed deficiencies in the procedure appointing the special prosecutor. The court held that the validity of his appointment and the validity of his acts may not be challenged collaterally. The authority of the special prosecutor to act can only be challenged by a direct challenge by the incumbent prosecutor. Since the special prosecutor who held that position did so under a color of appointment, he was a defacto special prosecutor, and the court did not err in overruling the motion to dismiss. *King* was followed in *Bagnell v. State* (1980) Ind.App., 413 N.E.2d 1072 upon facts identical to *King*. *Goldsmith*, where the successor incumbent prosecutor was the challenger, is wholly distinguishable.

Pursuant to the authority of *King* and *Bagnell*, Richardson and Wininger's position is untenable. The incumbent successor prosecutor's affidavit disqualifying himself, in our opinion, removes the case from the operation of *Goldsmith* upon the merits. We read *Goldsmith* to proceed upon the implied basis that the new prosecutor was not burdened with the same disqualifications as the old one as exists here. Certainly Levco's appointment would continue until challenged, which was after the self-disqualification by the successor prosecutor.

Issue II. *Handwriting Standards.*

■ This issue is the principal thrust of Richardson and Wininger's appeal. Richardson and Wininger were charged with two counts of conspiracy to utter forged instruments. Count I was addressed to the alleged forgery of the will of Beryl Jane B. Crawford, hereinafter referred to as Exhibit 10, Count II was addressed to the alleged forgery of six certificates of stock in Interlake, Inc., representing 12,976 shares, here-inafter referred to as Exhibits 1–6. Necessarily, proof that Exhibits 10 and 1–6 were forged is the critical element of the State's case. The State's proof of forgery was advanced by two examiners of questioned documents. IND.CODE 34–3–6–1 permits evidence of comparison:

> "In any proceeding before a court or judicial officer of the state of Indiana where the genuineness of the handwriting of any person may be involved, any admitted or proved handwriting of such person shall be competent evidence as a basis for comparison by witnesses, or by the jury, court or officer conducting such proceeding, to prove or disprove such genuineness."

Before evidence of comparison is given, the genuineness of the handwriting, or known writings or standard, must be proven. The criteria for adequacy of such proof was set forth in *Plymouth Savings and Loan Assn. No. 2 v. Kassing* (1919), 72 Ind.App. 1, 125 N.E. 488:

> "We believe the true rule deduced from the authorities to be that the genuineness of a 'standard' writing may be established (1) by the admission of the person sought to be charged with the disputed writing made at or for the purpose of the trial or by his testimony; (2) by witnesses who saw the standards written or to whom or in whose hearing the person sought to be charged acknowledged the writing thereof; (3) by evidence showing that the reputed writer of the standard has acquiesced in or recognized the same, or that it has been adopted and acted upon by him in his business transactions or other concerns. This is the rule adopted by the Court of Appeals of New York in *People v. Molineux, supra* [168 N.Y. 264, 61 N.E. 286], with the exception that the court there held that such standard might also be proved by witnesses whose familiarity with the handwriting of the person who is claimed to have written the standard enables them to testify to a belief as to its genuineness, that is, that its genuineness might be proved by expert testimo-

ny. We, however, are not ready to adopt this last doctrine. We believe the better rule to be that such standards cannot be proved by expert testimony, and that before they can be submitted to the jury for comparison the proof of their genuineness should be clear so as to raise no collateral issue."

*Plymouth Savings & Loan Assn. No. 2, supra,* 125 N.E. at 494.

*Plymouth* was followed and approved in *Snider's Executor v. Preachers Aid Society* (1942), 111 Ind.App. 410, 41 N.E.2d 665, and *Wells v. State* (1970), 254 Ind. 608, 261 N.E.2d 865. Richardson and Wininger argue here that the standards were not proven in accordance with *Plymouth.*

The State produced Clark Mercer, an examiner of questioned documents for the Indiana State Police, who testified that he used as standards 25 canceled checks designated as State's Exhibits 237–A through Y. These, along with a large number of other documents, were given to him by the son of Crawford, Christopher Crawford, and his attorney, Ron Smith, who represented to Mercer by out of court assertions that Exhibits 237–A through Y were the known signatures of Crawford. He selected the 25 checks after cross-comparison of all of the purported known signatures given to him. All of the checks were on the Citizens State Bank of Petersburg, and all bore Crawford's name printed thereon, as well as a signature purported to be Crawford's. Inexplicably, the State failed to produce any witness to testify as to the genuineness of the signatures on any of the documents. Mercer testified that he had no personal knowledge that these signatures were the known signatures of Crawford. Over objection, these 25 checks were admitted and became a standard for Mercer's opinion that the will, Exhibit 10, and the stock certificates, Exhibits 1–6, were not signed by the same person. In essence they were forged.

The State next produced Williams Mearns, a questioned document examiner for the Federal Bureau of Investigation. Mearns testified that he had received the questioned documents, Exhibits 1–6 and Exhibit 10, as well as purported known signatures. The known signatures consisted of Exhibits 237–A through Y, the 25 checks; Exhibit 240, a letter purportedly written by Crawford to Wininger; Exhibit 242, a purported will signed by Crawford on January 20, 1960; Exhibit 245A, a notebook or diary purportedly written by Crawford; and Exhibit 245B, a letter purportedly written by Crawford to her son, Christopher. All these exhibits were represented to him by out of court assertions to be the known signatures of Crawford. Again, no witness identified them in court in any manner as being the authentic known signatures of Crawford, and Mearns had no personal knowledge of that fact. Mearns made no cross-comparisons between any of the known signatures.

Over strenuous objections Mearns was permitted to testify that the questioned documents, Exhibits 1–6 and Exhibit 10, were not authored by the same person who authored the known signatures in Exhibits 237–A through Y, 240, 242, 245A and B. In essence, he testified that the signature on the will and the certificates were forgeries. The evidence reflected that in formulating his opinion Mearns relied mainly upon the 25 checks, Exhibits 237–A through Y.

During arguments in trial court on objections to the admissibility of the standards based upon the fact that the standards were not first proven to be the known signatures of Crawford, the State conceded that the standards had to be authenticated or their admission would constitute grounds for a mistrial. It promised to later present authenticating testimony. After Mearns had testified, the State belatedly called Christopher Crawford, Crawford's son. He testified that he was familiar with Crawford's handwriting and that she authored Exhibits 240, 242, 245A and B. He did not see her sign those exhibits, nor hear her acknowledge that she had signed them. No explanation was made that she had acquiesced in or adopted the signatures. As to Exhibits 237–A through Y, he stated

that "they appear to be my mother's handwriting." The difference in the strength of his opinions as to his answer identifying 237–A through Y, and his answer identifying 245A and B, was due to the fact that he had seen 245A, the notebook, in her possession and had received B, the letter, through the mail. He acknowledged that he was not qualified to judge the subtilities of handwriting differences, but rather based his opinion more on circumstances. He also admitted that he had even testified that the writing on the questioned documents, Exhibits 1–6 and 10, also looked like his mother's handwriting. In addition, he admitted that he never saw his mother write in the notebook and that there were differences in the writing in the entries.

The question is whether the admission and use of the standards in the manner described is reversible error. We are of the opinion it is.

The State concedes that the record does not disclose adequate proof of Exhibits 237–A through Y, 240 and 242 as standards sufficient to satisfy *Plymouth.* It argues first that 245A, the diary, would conform to *Plymouth* criteria since it had been in her possession, and second that Exhibit 245B would likewise conform because no one would forge a personal letter. It concludes that since Exhibit 245A and B would conform and since Mearns found no difference between the standards, then all of the standards are authenticated. We disagree. *Plymouth* does not permit proof of standards by expert testimony, or by proof by persons who claim to be familiar with the questioned writings, as such evidence merely raises collateral issues.

■ Admissions of standards without proper proof is error. *Wells, supra.* In *Wells* the handwriting analyst delivered his opinion based upon properly authenticated standards, but later in his testimony, after the opinion had been given, inadequately authenticated standards were offered and admitted. However, the witness gave the inadequate standards "very little weight" in his analysis. *Wells, supra,* at 872. The court held that under those circumstances

the error was harmless. In the present case, Mearns testified solely from inadequately proven standards, Exhibits 237–A through Y. Mearns' opinion was based upon those 25 checks as well as Exhibits 240, the old will, and 245A and B, the notebook and letter respectively. In short, he based his opinion on 28 inadequately proven standards out of the 30 offered. In reading his testimony it is clear that he relied heavily upon the checks, Exhibits 237–A through Y.

The error becomes magnified in light of defense testimony. Richardson and Wininger produced Dorothy Gray who testified that she saw Crawford sign defendant's Exhibit D, a check. They also produced Carl Gray, a lawyer, who testified that he saw Crawford sign defendant's Exhibits E, F, G, H, I, J, K, L, M, N, and Q, being documents signed by her in his presence during the course of the administration of her husband's estate. Gray testified that she acknowledged signing Exhibit Q, a letter written by her to him during the same administration. Three examiners of questioned documents, Patrick J. Bolan from Omaha, Nebraska, Frank Stubbs from Beaumont, Texas, and Harold Rodin from Xenia, Ohio, were then produced by Richardson and Wininger. Bolan testified that the Exhibits 237–A through Y, used by the State as standards, had irreconcilable differences among them. Therefore, because of a lack of a proper standard, he could not make a comparison with the questioned documents. Frank Stubbs and Harold Rodin, using the defendant's Exhibits D through Q as standards, concluded that those standards and the questioned documents were authored by the same person. In essence, they testified that the signatures on Exhibits 1–6 and 10 were not forgeries. The standards used by Richardson and Wininger were properly proven. Since the proof of forgery is essential to the State's case, and its standards were not properly proven, clear prejudice exists. Admitting or excluding evidence vital to an appellant's case is prejudicial. *American*

*United Life Insurance Co. v. Peffley* (1973), 158 Ind.App 29, 301 N.E.2d 651.

We are of the opinion that prejudicial error exists and this cause is reversed on this issue. The trial court is ordered to grant Richardson and Wininger a new trial.

Issue III. *Sufficiency of the Evidence.*

■ Richardson and Wininger do not argue that the evidence which was admitted at trial is insufficient to sustain a conviction, but argue that if the inadmissible standards and opinions based thereon in Issue II are deleted, there is insufficient evidence to support a conviction. They claim, therefore, they are entitled to discharge rather than merely being granted a new trial. We first observe that the evidence presented is more than adequate to support the verdict.

■ It is true that double jeopardy precludes a second trial where the reviewing court has found that the evidence is insufficient to support a verdict of guilty, and the defendant is entitled to discharge. *Smith v. State* (1979), 270 Ind. 479, 386 N.E.2d 1193. Nevertheless, a defendant is not entitled to discharge where the new trial is ordered to rectify a trial error. *Irons v. State* (1979), 272 Ind. 287, 397 N.E.2d 603, and cases cited therein. In *Irons* the court said:

> "The defendant's prior conviction was not reversed for insufficiency of the evidence, but for trial error in the admission of improper evidence. The defendant and his accomplice were convicted in their first trial, wherein the confessions of each were admitted into evidence although they were tried jointly, and neither testified. On appeal, we held that the redactions in the confessions had not been adequate to avoid obvious inferences of involvement, against which the appellants could not cross examine, and the judgment of the trial court was reversed and new trials ordered. It is true that at the first trial, but for the confessions improperly admitted, the evidence would have been insufficient to sustain the verdict. It is also true that, in essence, the evidence improperly admitted at the first trial is essential to his conviction in the second. However, that evidence was not inadmissible per se but was inadmissible at the first trial only because of the form in which it was tendered. At the first trial, he had no opportunity to cross examine the witness from whom the critical evidence came. The retrial afforded him the opportunity that had previously been denied him. It does not appear, then, that he was, in reality, harmed by the error of the first trial, but without the retrial, that could not have been determined."

*Irons, supra,* 397 N.E.2d at 606.

Here, the standards presented were not inadmissible per se, but were admitted erroneously, upon hearsay evidence through the questioned document examiners. Therefore, the posture of this case is exactly like *Irons*.

For the above reasons, this cause is reversed and the trial court is ordered to grant Richardson and Wininger a new trial.

Judgment reversed.

ROBERTSON, J., and YOUNG, P.J., (sitting by designation), concur.