## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Nov 29 2017, 9:56 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Bethany Redinbo
Delphi, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ellen H. Meilaender
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Leon H. Tyson,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

November 29, 2017

Court of Appeals Case No.
20A03-1704-CR-789

Appeal from the Elkhart Superior Court

The Honorable Teresa L. Cataldo, Judge

Trial Court Cause No.
20D03-1512-MR-3

**Baker, Judge.**

[1] Leon Tyson appeals his conviction for Murder.[1] Tyson argues that the trial court erred in admitting certain evidence and that the prosecutor committed misconduct amounting to fundamental error. Finding that the trial court did not err and that the prosecutor did not commit misconduct, we affirm.

## Facts

[2] In June 2015, Danielle Buford and Tyson were dating and Tyson lived with Buford at her apartment in Elkhart. On June 19, 2015, Buford's uncle, Tommie Strowder, Buford's mother, and a friend were sitting together outside her apartment. Two young men briefly stopped by to speak with Buford. Later, Buford and her mother heard four gunshots and saw the two men running down an alley next to her apartment. Tyson arrived shortly thereafter.

[3] When Buford woke up the next day, June 20, 2015, Major Warren and William Drake, who were friends of Tyson, were at the apartment. Strowder, who had spent the night at the apartment, needed a ride home, and Tyson volunteered to take him in Buford's blue Volvo. Strowder and Tyson left together and Buford left to run errands. Additionally, at some point that same morning, a neighbor saw three men in a small, blue car attempting to "hide" a gun in the car's glove compartment. Tr. Vol. III p. 96.

---

[1] Ind. Code § 35-42-1-1.

[4]     Later that day, Tyson called Buford. He was "upset" and told Buford that she needed to return to the apartment immediately. *Id.* at 31. Warren and Drake were waiting outside when Buford arrived. When she entered the apartment, Tyson asked her to go to the bedroom and, as soon as she walked past him, he shut the front door and pointed a handgun at her, saying, "'Your uncle stole my sh*t, and you know all about it.'" *Id.* at 32. Buford then went into the bedroom and, after Tyson ordered her not to leave the bedroom, he took her phone and left.

[5]     Later, Tyson returned with Strowder and, while pointing the gun at Strowder and Buford, ordered them to different corners of the living room. Tyson was upset because he believed Strowder had taken another gun and ordered Strowder to return it or pay him $300. Buford testified that Tyson repeatedly told Strowder, "'You did this. You're the reason . . . your niece is going to die.'" *Id.* at 35. To get the money, Tyson permitted Strowder to call Toricha Williams, the mother of Strowder's son. Williams testified that Strowder seemed scared; he requested that she look for $300 hidden in a tube sock in their basement because his "'life depended on it.'" *Id.* at 134. While she was looking, she heard a male voice arguing with Strowder. After Williams's search proved fruitless, Strowder went silent and Williams heard a woman screaming.

[6]     Buford testified that after Williams could not find the money, Strowder stood up and told Tyson, "'you're not going to kill [me].'" *Id.* at 36. Strowder then opened the door to the porch and attempted to flee. He made it out of the apartment when Tyson fired the gun at least two times. When Buford got up

and exited the apartment, she did not see Tyson but found Strowder on the ground outside her apartment. Several witnesses heard the shots and saw one or two Black men exit the apartment, enter a blue car, and drive away.

[7] Immediately after witnessing the shooting, Buford was concerned that she would be blamed, so she threw away some of the empty shell-casings. She did not call 911; instead, she went to Tyson's sister's residence, where she found Tyson and her blue Volvo. Tyson asked Buford to drive him to Chicago and she agreed to do so out of fear.

[8] Elkhart City Police Department Sergeant Daniel Mayer was the first officer at the scene. When he arrived, Strowder was still alive, but he died shortly thereafter. After conducting a search, police officers found a spent .45-caliber shell-casing under a minivan.

[9] On June 21, 2015, while in Chicago, Tyson gave Buford the key to his minivan and instructed her to give the key to a friend and not to tell anyone about what had happened. When Buford arrived in Elkhart, she immediately told her family and eventually told the police about the incident, including hiding the spent .45-caliber shell-casings in the trash.

[10] Later that day, police responded to a report that a man was removing items from Buford's apartment and putting them in a minivan. When police arrived, the unidentified male fled and police pursued him. The police lost sight of the man in an alley adjacent to or near the apartment, but uncovered a .45-caliber Springfield semi-automatic handgun lying under a bush. A few days later,

police officers also recovered the spent .45-caliber shell-casings in the trash and an autopsy recovered two .45-caliber bullets from Strowder's body. Subsequent ballistics tests demonstrated that the two bullets recovered from Strowder's body and the recovered shell-casings from under the van and in the trash were fired from the handgun.[2] Appellant's App. Vol. II p. 4-5. After comparing a latent fingerprint on the magazine of the gun to exemplar fingerprints on file for "Leon Tyson," the fingerprint analyst determined that the fingerprint on the magazine matched the exemplar prints on the card.

[11] On December 7, 2015, the State charged Tyson with murder and Level 3 felony criminal confinement. Tyson's jury trial took place on January 23-26, 2017, and the jury found Tyson guilty of murder and not guilty of criminal confinement. On March 14, 2017, the trial court sentenced Tyson to sixty-three years imprisonment, with five years suspended to probation. Tyson now appeals.

# Discussion and Decision

## I. Evidentiary Issues

[12] Tyson first argues that the trial court erroneously admitted certain evidence. The admission and exclusion of evidence falls within the trial court's sound discretion, and we will reverse only if the decision is clearly against the logic

---

[2] On January 25, 2017, the parties entered into a written agreement attesting to the accuracy of the ballistics tests and stipulating that the reports were admissible.

and effect of the facts and circumstances before it. *Johnson v. State*, 6 N.E.3d 491, 498 (Ind. Ct. App. 2014). However, even if the trial court erroneously admits evidence, we will not reverse if the admission constituted harmless error. *Micheau v. State*, 893 N.E.2d 1053, 1059 (Ind. Ct. App. 2008).

## A. Evidence Concerning June 19, 2017

[13]     Tyson first contends that the evidence and testimony regarding the events of June 19, 2017, the night before the shooting, was improperly admitted for a variety of reasons. *See* Appellant's Br. p. 14-20; Ind. Evidence Rules 401, 403, 404(b)(1).

[14]     We agree with the State that "[t]his evidence was a minor piece of the case." Appellee's Br. p. 17. Aside from the evidence regarding June 19, there was eyewitness testimony establishing that Tyson had a gun that he used to shoot Strowder; further, there was an independent ballistics analysis tying the bullets from Strowder's body to the murder weapon and an independent fingerprint analysis tying the murder weapon to Tyson. In other words, the conviction is supported by such substantial independent evidence of Tyson's guilt that there was no likelihood that the evidence regarding June 19 contributed to the conviction. *See Meadows v. State*, 785 N.E.2d 1112, 1122 (Ind. Ct. App. 2003) ("The improper admission of evidence is harmless error when the reviewing court is satisfied that the conviction is supported by substantial independent evidence of guilt so that there is no substantial likelihood that the challenged

evidence contributed to the conviction."). Therefore, any error in the admission of this evidence was harmless.

## B. The Fingerprint Analyst's Report

[15] Next, Tyson argues that the trial court improperly admitted the fingerprint analyst's certificate of analysis (report), which concluded that one of the fingerprints on the magazine of the gun matched fingerprints on an exemplar print card listing Tyson's name. Only the analyst's report was admitted into evidence; the State did not seek to have the exemplar card admitted.[3] Tyson contends that the report should not have been admitted because the exemplar fingerprint card itself was never authenticated.[4] He does not argue that the report itself was not properly authenticated.

[16] Initially, we observe that certain evidence must be authenticated before being admitted into evidence, which occurs when "the proponent . . . produce[s] evidence sufficient to support a finding that the item is what the proponent claims it is." Evid. R. 901(a). Indiana Rule of Evidence 901(b) provides several means of authentication, including the following:

---

[3] The latent fingerprint from the magazine of the gun and the chart showing a comparison of the fingerprints were properly admitted into evidence; neither are at issue here. *See* State's Ex. 75, 301; Tr. Vol. III p. 243.

[4] Tyson also suggests that the fingerprint exemplar card would be inadmissible hearsay. We decline to address this question, or whether the card would qualify as a "record[] of a regularly conducted activity," *see* Evid. R. 803(6), because the card was never admitted into evidence and because we conclude that the fingerprint analyst was entitled to rely on the card in forming her opinion. *See also* Evid. R. 703 ("Experts may testify to opinions based on inadmissible evidence, provided that it is of the type reasonably relied upon by experts in the field.").

> *(b) Examples.* The following *are examples only, not a complete list*, of evidence that satisfies the requirement:

> \*\*\*

> > (3) *Comparison by an Expert Witness or the Trier of Fact.* A comparison with an authenticated specimen by an expert witness or the trier of fact.

(emphasis added). Tyson argues that, pursuant to Rule 901(b)(3), "the State was attempting to admit a [report] of fingerprint comparison, and as such, the comparison should have been done with an authenticated specimen." Appellant's Br. p. 21.

[17] Tyson points to no authority, nor do we find any, suggesting that if an expert bases his or her opinion on unadmitted evidence, then these bases must be formally authenticated.[5] Instead, the opposite is true. *See, e.g.*, Evid. R. 703 ("Experts may testify to opinions based on inadmissible evidence, provided that it is of the type reasonably relied upon by experts in the field."); *Faulkner v. Markkay of Ind., Inc.*, 663 N.E.2d 798, 800 (Ind. Ct. App. 1996) (noting that an expert may offer his or her opinion based in part on reports not in evidence and inadmissible hearsay, if certain conditions are met). Tyson does not dispute

---

[5] The only Indiana cases cited by Tyson address issues with authenticating *admitted* evidence, not authenticating the unadmitted bases for an expert's opinion. *See Wininger v. State*, 526 N.E.2d 1216 (Ind. Ct. App. 1988); *Richardson v. State*, 486 N.E.2d 1058 (Ind. Ct. App. 1985). Similarly, *United States v. Hernandez-Herrera*, 952 F.2d 342 (10th Cir. 1991), addresses the issue of authenticating an *admitted* photocopy of the defendant's fingerprint.

that the fingerprint analyst was an expert, that a fingerprint exemplar card from a police database is evidence normally relied upon by fingerprint analysts, or that the report itself was properly authenticated by the analyst at trial. Thus, the report was properly admitted; if Tyson had qualms with any of the report's bases, those doubts should have been flushed out through "vigorous cross-examination, presentation of contrary evidence, [and] argument of counsel" at trial. *Bennett v. Richmond*, 960 N.E.2d 782, 786-87 (Ind. 2012) (quoting *Sears Roebuck & Co. v. Manuilov*, 742 N.E.2d 453, 460-61 (Ind. 2001)).

## II. Prosecutorial Misconduct

Finally, Tyson argues that the prosecutor committed misconduct during closing argument in four ways: (1) alluding to unadmitted evidence, (2) vouching for the State's witnesses, (3) attacking the credibility of Tyson's witnesses, and (4) appealing to the passions and prejudices of the jury.[6]

In reviewing a claim of prosecutorial misconduct, we must determine whether misconduct occurred and, if so, whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he would not have been subjected otherwise. *Ryan v. State*, 9 N.E.3d 663, 667 (Ind. 2014). Where, as here, the defendant waived a prosecutorial misconduct claim by failing to object at trial, to succeed on appeal he must also establish

---

[6] Because we do not find any instances of misconduct, we decline to address Tyson's final argument that "the cumulative effect of the State's misconduct made a fair trial for [Tyson] impossible." Appellant's Br. p. 38.

that the prosecutorial misconduct constituted fundamental error. *Id.* at 667-68. To make a successful claim of fundamental error, the defendant must show that the alleged errors are so prejudicial to his rights as to make a fair trial impossible. *Id.* at 668. To make this showing, the defendant must show that, under the circumstances, the trial court erred in not sua sponte raising the issue because the alleged errors (1) "'constitute clearly blatant violations of basic and elementary principles of due process'" and (2) "'present an undeniable and substantial potential for harm.'" *Id.* (quoting *Benson v. State*, 762 N.E.2d 748, 756 (Ind. 2002)). "In judging the propriety of a prosecutor's remarks, we consider statements in the context of the argument as a whole." *Seide v. State*, 784 N.E.2d 974, 977 (Ind. Ct. App. 2003).

## A.  Alluding to Unadmitted Evidence

[20] "[C]ounsel . . . must not imply a superior personal knowledge, or otherwise suggest to the jury that he has additional, undisclosed evidence of either guilt or innocence, which may induce the jury to decide the case on reliance on matters outside the evidence." *Lopez v. State*, 527 N.E.2d 1119, 1125-26 (Ind. 1988).

[21] During closing argument, the prosecutor made the following statements:

- "And I would suggest to you all, the state didn't call every witness that the police talked to. We are trying to present the most concise, efficient case for you all based on who the state believes can provide the best information." Tr. Vol. IV p. 147.

- "We tried to be as efficient and call the most credible witnesses in the situation we could put on." *Id.* at 173.

Upon first glance, these statements might appear to imply that the prosecutor knew of additional, unadmitted testimonial evidence. However, after reviewing the whole record, it is apparent that the prosecutor's statements were in response to Tyson's arguments that the police and the prosecution unfairly singled out Tyson by failing to interview, more thoroughly investigate, or otherwise seek Warren's or Drake's testimony. *See, e.g.*, Tr. Vol. II p. 46-47; Tr. Vol. IV p. 62-64, 161-62. Because the prosecutor made these comments in response to Tyson's arguments, the prosecutor did not act improperly. *Brown v. State*, 746 N.E.2d 63, 68 (Ind. 2001) ("A prosecutor may respond to inferences raised by the defense, even if that response would otherwise be objectionable.").

[22] Even if the prosecutor meant to imply that he had access to additional evidence of Tyson's guilt, we cannot say that the statements would have made a fair trial impossible. Absent the statements, there was compelling evidence supporting Tyson's guilt, including eyewitness testimony, ballistics evidence linking the bullets in Strowder's body to the murder weapon, and a fingerprint tying the gun to Tyson. Considering this strong evidence, we cannot say that two isolated statements regarding the efficiency of not calling additional eyewitnesses had a "probable persuasive effect on the jury's decision." *Washington v. State*, 902 N.E.2d 280, 290 (Ind. Ct. App. 2009). In short, these statements do not amount to fundamental error.

# B. Improper Vouching

[23] A prosecutor may not state his personal opinion regarding the credibility of a witness during trial, as such statements amount to vouching for a witness. *Thomas v. State*, 965 N.E.2d 70, 77 (Ind. Ct. App. 2012). However, "a prosecutor may comment as to witness credibility if the assertions are based on reasons arising from the evidence presented in the trial." *Id.*

[24] With respect to this argument, Tyson finds issue with the following italicized statements:

- "I mean, if this person, based in particular part on the demeanor, was just flat out lying—I mean, the Academy Awards are coming up. Wish I'd had a camera in here because she would be up for the Academy Award. *Is she acting? No. Is she coming up with tears on her own, you know, to make something up? No.* This is the demeanor, the behavior on the stand, and I would suggest the demeanor and the behavior, unfortunately right after the shooting of somebody who's living a real-life experience, is trying to come in to a court of law with you folks, answer questions, face the person that shot her uncle. *This is not the demeanor of somebody who's getting up here and telling you all a lie.*" Tr. Vol. IV p. 144-45 (emphases added).

- "Let's talk a little bit more—we're talking about Danielle Buford. *If you believe her beyond a reasonable doubt—and on behalf of [the] state I would suggest absolutely you should.* If you believe her beyond a reasonable doubt with regard to this important part, the substantive essential elements that I think we talked about, then the defendant is guilty." *Id.* at 153-54 (emphasis added).

[25] Beginning in opening statements, Tyson continuously attacked the veracity of Buford's testimony:

> Fool me once, shame on you. Fool me twice, shame on me. Danielle Buford fooled investigators on at least two occasions when she was giving her statements on this case and yet she is the critical identification witness in your trial. She's the only identification witness. She admitted to lying about critical facts, critical facts, and, yet, the State's going to rely on her.

Tr. Vol. II p. 44-45. Later, Tyson repeatedly emphasized Buford's previous inconsistent statements and lies during cross-examination, *see, e.g.*, Tr. Vol. III p. 67-68, and reemphasized these issues during closing argument, *see, e.g.*, Tr. Vol. IV p. 170. Accordingly, we cannot say it was improper for the prosecutor to rely on observable facts from Buford's testimony, such as her demeanor and behavior while testifying, to respond to the allegation and implication that Buford was also lying about witnessing the murder. *See Ryan*, 9 N.E.3d at 670-71 (finding prosecutor's statements that the witness was credible and told the truth were permissible because they were based on facts from evidence); *Dumas v. State*, 803 N.E.2d 1113, 1118 (Ind. 2004) (noting that where defendant asserted that State's key witness was lying, the "prosecutor was entitled to counter with argument that the witness was not lying . . . ."). In sum, the prosecutor did not act improperly, let alone commit fundamental error, by making these statements.

## C. Attacking the Defense Witnesses' Credibility

[26] A prosecutor may not comment on a witness's credibility if those comments are not based on the evidence at trial. *See Cooper v. State*, 854 N.E.2d 831, 836 (Ind. 2006). During the trial, Tyson called two witnesses to testify about the events

immediately after the shooting. These witnesses offered descriptions of the shooter that were inconsistent with Tyson. During closing argument, Tyson emphasized these witnesses to cast doubt on the accuracy of the State's evidence. During rebuttal, the prosecutor made the following remarks:

> I mean, God love [the two witnesses], but there's a reason why the state did not put them on the stand. We tried to be as efficient and call the most credible witnesses in the situation that we could put on. Were they consistent? Shots fired, two guys come out; both of them are black; the guy in the back has got a gun; the guy in the front doesn't. One person gets into a blue Volvo, drives down the street, and goes to the right. At the end of the day, that's actually pretty consistent with exactly what happened. I mean, I'm not looking at the Coke-bottle glasses that these guys have on; but to hang your hat somehow on whether or not there was brown hair or some short hair, on behalf of state, I don't think so.

Tr. Vol. IV p. 173. Tyson contends that these statements were improper attacks on his witnesses' credibility, amounting to fundamental error. We disagree.

[27] First, while the State admits that the prosecutor could have been more explicit in referring back to the testimony elicited from the witnesses, we note that there are enough facts in the record to infer that these statements were based on earlier evidence: the witnesses testified that they saw two Black men leaving the scene and that the man with the gun had hair; both witnesses also wore glasses due to poor vision. Thus, it is clear from this context that the prosecutor's statement was merely questioning the wisdom of calling these two

witnesses—while generally reminding the jury of concerns in the record about their reliability[7]—to testify to a narrative previously covered by other witnesses.

[28] Even if we assume solely for argument's sake that the statements were improper, we cannot say that they rise to the level of fundamental error. These were isolated statements during closing argument, long after jurors had had time to assess and weigh the credibility of these two witnesses. As discussed above, there was compelling, independent evidence supporting Tyson's guilt, including eyewitness testimony, ballistics evidence linking the bullets in Strowder's body to the murder weapon, and a fingerprint tying the gun to Tyson. In other words, we cannot say that a few statements relating to the wisdom of calling two of Tyson's witnesses produced an "undeniable and substantial potential for harm" or otherwise made a fair trial impossible. *Ryan*, 9 N.E.3d at 668.

## D. Appeals to the Jury's Passions and Prejudices

[29] Finally, Tyson asserts that the prosecutor made an improper appeal to the jury's passions and prejudices. "We observe that '[i]t is misconduct for a prosecutor to request the jury to convict a defendant for any reason other than his guilt' or 'to phrase final argument in a manner calculated to inflame the passions or

---

[7] During trial, besides establishing that both witnesses wore glasses and neither saw the shooting, the prosecutor also elicited that one witness said that he had difficulties telling Black people apart and that the other took medication to assist her with her behavior.

prejudice of the jury.'" *Neville v. State*, 976 N.E.2d 1252, 1264 (Ind. Ct. App. 2012) (quoting *Johnson v. State*, 453 N.E.2d 365, 369 (Ind. Ct. App. 1983)).

[30] During closing argument, Tyson's counsel made the following statements:

> And the decision that you have to make now—consider yourself 20 years down the road. You're eating dinner with your family. You're enjoying your freedom, your liberty, and you think back on this case. Are you going to be so sure on your decision that you're willing to take those liberties from someone else?

> It's a sad case. It's sad what happened to Mr. Strowder. We all want to hold someone accountable, but it's just as sad to hold the wrong person accountable. Mr. Strowder is dead. . . . In a sad way, justice has been done. And to ruin [another] life just because you want to hold someone accountable, even though the evidence shows it's not Mr. Tyson, that's not what we're here to do.

Tr. Vol. IV p. 170. During rebuttal, the prosecutor made the following statements at issue:

> You know, we can't put ourself in Danielle Buford's head. Every time we work on a case like this we deal with victims' families. We deal with all these witnesses. Nobody wants to be involved in this. We'd all like to be some place else. Do you know why Leon Tyson is in trouble? He's in trouble because of himself. He's in trouble because of himself.

> Twenty years from now, I would suggest you should think back on the case and go, you know what, we did a good thing that week. [Strowder] deserved some justice. His family deserves some justice. The citizens of the community deserve some justice.

*Id.* at 173-74.

[31] It is clear from the context that the prosecutor's statements were in direct response to Tyson's closing argument. *See Ryan*, 9 N.E.3d at 669. As aptly put by the State, "it is an entirely legitimate comment in response to Defendant's argument, which was the first to appeal to the passions of the jurors and to ask them to base their verdict on their own feelings of guilt at depriving a man of his liberty." Appellee's Br. p. 35. Accordingly, we find Tyson's argument unavailing.

[32] In sum, we do not find any instances of prosecutorial misconduct, let alone any that amount to fundamental error.

[33] The judgment of the trial court is affirmed.

Bailey, J., and Altice, J., concur.